Everly. Good morning. May it please the court. My name is Louisa Everly and I'm here today representing petitioners, Healthy Gulf and Sierra Club. This case is about a Clean Water Act section 404 permit allowing construction of the driftwood LNG export facility near Lake Charles, Louisiana, that will permanently destroy 320 acres of wetlands. That's roughly the size, three quarters the size of the French Quarter. The wetlands here provide high quality habitat, water purification, and flood protection along the Calcasieu Ship Channel. Today I'll talk about petitioners two claims. On each, the Army Corps entirely failed to make the inquiries or findings required by the Clean Water Act. First, the Corps violated its own regulations and this court's holding in Atchafalaya Basin Keeper by deviating from the rigid compensatory mitigation hierarchy to choose an inferior option four steps down the hierarchy without acknowledgement or explanation. Second, the Corps violated the Clean Water Act by failing to require the least environmentally damaging practicable alternative or LEDPA because it has roughly 38 football fields worth of wetlands. The Corps' response is that petitioners failed to exhaust this LEDPA claim and that its failure to evaluate the alternative was harmless anyway. Turning to our first claim, the Corps violated the rigid hierarchy in the regulations by approving driftwoods permittee responsible mitigation plan without justification. Under the regulations, the Corps shall consider the type and location options in the order presented. That starts with option one, which is mitigation bank credits, and goes all the way to option five, offsite permittee responsible mitigation, like the plan that driftwood proposed here. This is, this order is because mitigation banks have less risk, better scientific management, larger scale, and better financial security. Didn't they give a reason that they thought this was a better approach? And you keep saying the word rigid. I don't, the word rigid is not in the regulation or our case, is it? Your Honor, they, so to answer your first question about the answer that they gave, there was a place in the record where there's a question that says, are you deviating? They said no. And then it said, provide justification for deviating, and they wrote N-A. There was a separate place a couple pages prior in their memorandum for the record where they stated, they restated driftwood's position that this, that driftwood had determined that this would be an independent judgment. To answer your second question regarding the phrase rigid, this court did, in the Atchafalaya case, was restating what the district court had said, and there, the district court had found that the regulations do not impose a rigid, a mechanical and rigid hierarchy. And this court determined that that was incorrect, and went on to say if this language does not set up a plain hierarchy, strongly approving of mitigation banks, it is hard to know what would do. So deference. They said not a, they didn't say it was rigid either. They just said it's a hierarchy. They said the district court was incorrect to say that it wasn't rigid. Okay. Um, so deference is inappropriate because the regulations are clear. Atchafalaya confirmed that the regulations establish either this strict legal hierarchy, or at a minimum, a strong presumption in favor of mitigation banks. Isn't this better in this circumstance, what they chose though, rather than the mitigation banks? Don't they argue on the merits that this is actually better for the whole, whole environmental area? They assert that in their briefing, but there's nothing in the record establishing that they made that conclusion at the time. As I noted, they stated N.A. in the rationale for this deviating from the hierarchy, which establishes under the regulations, you're supposed to look at mitigation bank credits first. And there's no evidence here that they did that, or that they did this type of comparison that is contemplated under the regulations. Um, at oral argument in the Atchafalaya case, the counsel for the court asserted that permittee responsible mitigation, quote, has a long track record of failure. So the regulations want you to use approved mitigation bank credits as much as possible, end quote. And here, the court did not do that. They approved this dredged material plan for over half of the wetlands that will be destroyed by the terminal, and they did that without explanation. They, they marked N.A. Um, and this lack of explanation violates well-established principles under the Administrative Procedure Act, as well as the Clean Water Act, because we're not working from a blank slate here. We're working from a codified hierarchy. So N.A., or even a conclusory statement restating what the not enough to overcome the regulations conclusion that mitigation bank credits are more effective and more reliable than permittee responsible mitigation like this. Can I ask a question? Um, you, uh, um, alternative site six was not raised, uh, to the core as I understand it. Is that right? Am I right? Your Honor, you anticipated that I was about to turn to talking about this legal... Well, this is great. Mine's running in the same track then. Yes. Um, so, Your Honor, alternative site six was presented in comments that were sent to both the core and to FERC as part of the NEPA process. Here, the core chose to rely on the NEPA process that was being run by FERC as the lead agency. So these LNG facilities, FERC is designated as the lead agency for NEPA review. And here, the core participated as a cooperating agency and decided not to pursue their own NEPA process. They ultimately adopted large portions of FERC's final environmental impact statement. And as part of the development of that final environmental impact statement, there were public comments, in fact, one specific comment from an expert member of the public that stated that there was a better alternative with a map identifying this location and said it was a better alternative that would destroy fewer wetlands. But further on Judge King's question, Healthy Gulf's comment did not mention alternative site six. Is that true or not true? That is correct. Healthy Gulf's comment did not specifically identify alternative site six. But under this court's, um, case law, third party comments are enough. The real question here when we're looking within the general exhaustion framework is whether the agency was informed. And here, alternative site six was both obvious and brought to the expert member of the public, as well as the fact that FERC ultimately reviewed this alternative as part of their own analysis. And the core adopted that analysis. And part of adopting an analysis by another agency is doing the basic due diligence necessary to actually know what's in the analysis that you're adopting. And so here, it's disingenuous for the core to claim that it never had an opportunity to address alternative site six or that it wasn't aware of this alternative. Are you saying that the comment was timely? Because wasn't the comment itself untimely? The comment was timely within the NEPA process. Not within this process. There was no timely comment within this process that is what was being challenged here. The NEPA process is part of the core's analysis here and it's part of, under the regulations, the core is required to consider the comments that are submitted as part of the NEPA process when conducting its Clean Water Act review. But this is not timely under the LEDPA process. And there's, what case do you say that something that's not timely during the LEDPA process that arguably is timely under NEPA renders it timely for LEDPA process analysis? There's a regulation that requires the core as part of this LEDPA process to examine comments submitted as part of the environmental impact statement NEPA process. Even when they're untimely under LEDPA, you can't do that. Yes, Your Honor. 33 CFR 230.19C as well as 40 CFR. Say it again. 33 CFR 230.19C? Correct. And 40 CFR 1505.2 subpart B. So those say B as in boy or D as in boy? Yes. If those say that even if you're not timely under the LEDPA comments process, you are considered and deemed timely under, if you are within the NEPA timeline. Is that what those regulations say? Those do not say the timeliness aspect, but they do say... That's what we're talking about is the timeliness. So the regulations establish that the core has to consider those timeliness. It's immaterial which comment period the comments were submitted during because the core has to consider all of the comments, the comments that were submitted as part of the NEPA process. In the timely LEDPA process, you don't have to say our process is over, but we're going to have to wait until this other process and then reconsider those comments. That's not the way this works, is it? The core has independent obligations to under both NEPA and the Clean Water Act, the core is required to comply with NEPA, which includes doing this separate set of NEPA comments and reviewing material that is in the final outcome of the NEPA process. Here that was an environmental impact statement from FERC as well as a environmental assessment from the core. But the crux here is that the core chose, instead of doing its own NEPA process, the core chose to rely on FERC's NEPA process. And in doing so, it opened the door to public comments that were submitted as part of FERC's NEPA process. I have two quick questions. You argue that judicial notice of the Big Lake fuels materials is inappropriate because they're too voluminous. Can you provide any legal authority for this contention? I do not have a specific case that I could give you right now, except just the general proposition that the court should take judicial notice of materials that have been established reliably, where there's sufficient information to establish their reliability and their relevance. Are they forgeries? Is there some problem with these materials? Do you doubt their authenticity or their legitimacy in some way? I don't doubt their legitimacy. I do contest that because they were not raised previously and they were not part of the administrative record here, that they are appropriate for this court's consideration. This other question that I have is latches. If we reach the core's latches argument, can you provide any specific environmental benefits of allowing the suit to progress? Yes, I can. And just to clarify, it's not the core's latches argument, it's Driftwood's. Here we have the environmental benefits from saving at least 50 acres. There are indications in the record we're actually talking about more like 70 acres of wetlands, which this court recognized in the Coleman case are among the most productive ecosystems on earth. This is not a very small amount of wetlands. We're talking about a large amount of very precious coastal Louisiana wetlands that are very difficult to replace. Here we have about 125 acres of imperiled or difficult to replace, which are a special category of wetlands that require additional protection. So we're talking about that for the least environmentally damaging practical alternative claim and we're talking about ensuring that the mitigation that is used will be effective and will result in productive wetlands to achieve the goal under the Clean Water Act of no net loss of wetlands. Do you think they should kick the project off that's already there and ongoing? Your Honor, the project is based on a permit that is invalid and so this court should examine the permit and here we see two fundamental flaws in the core's analysis. One, the alternatives claim relates to step number one in the three part process that the court goes through when developing this kind of permit. No, I'm talking about on the alternative site. Are you saying they have to kick the project off on the alternative site? The Big Lake Fuels project? Yes. Is that what you're asking us to do? There isn't an indication that that would actually be required. We don't have the final plan permit in the materials that were provided. What we have is an outdated 2015 permit that expired in 2020 and we don't know what the current project status is. This is why we're arguing that this court needs to remand and we're not saying that the core cannot consider that alternative project on remand, but it's inappropriate for this court to get into that on a harmless error inquiry based on post hoc and extra record evidence at this time. With that, I would like to save the remainder of my time. Yes, you've saved time for rebuttal, Ms. Everly. Thank you. Mr. I'm going to try to pronounce Heminger, but if that's wrong, you can correct me. Heminger, Your Honor. Heminger, all right. Very close, yes, yes. Good morning, Your Honors. I may please the court. Justin Heminger for the Corps of Engineers. I'll take 14 minutes and Driftwoods Council will take six minutes. After two years of careful study, the Corps issued this permit, a Clean Water Act permit, in May of 2019, and that was four years ago. Now, this court's review is under the APA, which is a deferential standard, and the Corps just needs to make a decision that is rational. And this court will uphold that decision as long as the Corps' path can reasonably be discerned. Here, the Corps' decision meets that standard. First, the Corps complied with the Clean Water Act by selecting the least environmentally damaging practicable alternative. I'll refer to that as the LEDPA. The court, however, doesn't need to reach that issue because here, petitioners, no one timely raised Site 6 as an alternative that the Corps should consider as the LEDPA. Now, opposing counsel says they did timely raise it because they raised it in the NEPA process. Not them, but someone else raised it in the NEPA process. Someone else did raise it in the NEPA process, Your Honor, but that comment was directed to FERC. It was not directed to the Corps. Do you have authority that you don't have? They say the Corps had to take that in consideration, and therefore it's timely. You heard the argument, too, just like I did. Yes, Your Honor. Do you have any comment on that? Yes. So, I'm sorry, could you repeat your question, Your Honor? The question is, opposing counsel says it's timely because it was timely under NEPA and that the Corps at all times had a duty to consider all comments, even those received after the LEDPA process, if they were in the record for the NEPA process and cited two regulations and said there's no timeliness issue. Yes, Your Honor. So, we disagree with that position. First of all, I was trying to find the citations. I believe one of them is in the petitioner's reply brief, but I couldn't find the other citation in their briefs. But the citation, the one that I could find, says that the Corps must pay particular attention to responses to comments in the final NEPA document. And here, FERC did respond to the comment that it received about Site 6. FERC's response to that comment was that this is not a site that would be a correct alternative. But on exhaustion, I would go back to the Corps' regulation. So the Corps' regulation says that it is required to provide notice to the public of a permitting decision and then receive those comments and consider them. The Corps followed that regulation here, and it did that in roughly the spring of 2018. That was March and April of 2018. And in response to the public notice, the petitioner, Healthy Gulf, did submit comments. Other parties submitted comments as well. And what you see is that the Corps did consider those comments in its final permitting decision. That decision is under the Clean Water Act. We're here on a Clean Water Act claim, not on a NEPA claim. And as to the Clean Water Act claim, the Corps followed its process. It didn't receive a timely comment. It did respond to all comments that it timely received. And I think that what this shows, and this is why under SHRMPers, administrative exhaustion is important, the court's decision in SHRMPers. But I think it's important because without a timely notice, the court and the agency are deprived of the opportunity to fully consider this issue. So I guess to continue and focus on the LEDPA rather than on the mitigation issue, even if administrative exhaustion did not apply, we would say that the Corps' failure to discuss or omission of Site 6 from the LEDPA analysis does not prejudice the petitioners. We filed a motion for judicial notice about Site 6. So to back up in time, in 2015, the Corps issued a Clean Water Act permit to a different entity, Big Lake Fuels, to develop Site 6. So if you fast forward to 2019 when the Corps is considering whether to issue a permit to Driftwood and what the LEDPA is, at that time the Corps had already permitted Site 6 for a different project. So for the Corps' purposes, there would be no reason to consider Site 6 as even a possible alternative because the site has to be reasonably available, and the Corps doesn't tell applicants for Clean Water Act permits to try to obtain a site from a different party that they have already issued a Clean Water Act permit for. So this morning I did hear some questions about whether the Big Lake Fuels project is viable, and I also heard counsel for petitioners suggest that the permit, the Big Lake Fuels permit, that is before the Court on the motion for judicial notice has expired. We believe the evidence that we submitted with the motion for judicial notice adequately describes the renewed permit that was issued by the Corps in 2020. That permit itself, the amended permit, which expanded the size of the Site 6 project, is not in the record or in the motion for judicial notice, but we would be happy if the Court would like to see that amended permit. We'd be happy to submit that to the Court. Could you remind us what the Corps' position is on the latches argument? The Corps did not take a position on latches. Yes, Your Honor. You're agnostic on the topic. I can't take a position here today. Okay. So turning to mitigation, if the Court has no further questions about the LEDPA argument. Can you talk about the mitigation and whether or not the process complies with Atchafalaya? So the first point we would make is that the Corps did require full compensatory mitigation for all of the wetland impacts here, and at the end of the day, that's what's most important to the Corps, making sure that all impacts from this site would be compensated in some fashion. I thought you have to go in order, though. So there's a hierarchy, there's a preference, and we agree with the statement that there's a strong presumption. You heard that today. There's a strong presumption in favor of mitigation bank credits in the regulations. Those are at 33 CFR 332.3, and it's in B.1.2 through 6. So there is a strong preference for mitigation bank credits, but that same regulation, the plain text of the same regulation, allows the Corps to override that preference based on consideration of various factors. And so if you look at the Corps' decision, and this is at AR 299 through 301, those are the pages in the Corps' record of decision where it's discussing mitigation and what options it's selecting. In particular, I'd focus on AR 299. There the Corps did make a finding, a conclusion, that allowing driftwood to compensate for some of these impacts with the beneficial use plan would outweigh, that's the phrasing used, would outweigh traditional mitigation bank credits. It's better. Better than. Better for the wetland situation. That's right, Your Honor, and the reason for that, and you can see this discussed also in the record of decision at 259, AR 259, the reason for that is there are two parts to this project. The baseline in the beneficial use plan is that driftwood has to compensate for 185 acres of impacts. That compensation comes in the form of roughly 650 acres of coastal wetlands that have been destroyed over time and diminished over time. Driftwood has to restore those 650 acres. When they say what size of the French Quarter was it at the beginning, three-fourths the size of the French Quarter, is there another area that you think is being brought back that is bigger than the French Quarter? I'm just using their opening argument. Yes, Your Honor. I don't know how big the French Quarter is, but what I wanted to sort of add on is that this project is not just the 650 acres, so driftwood also plans to expand and restore up to 3,000 acres of coastal wetlands. So the full beneficial use plan is not just the compensation for the impacts, but it's also the additional benefit to Louisiana coastline. And on that point, certainly that on its face is environmentally preferable, and if you look at the regulations at the end of the day, this is 332.3A1, the district engineer's central responsibility is to choose an option for mitigation that's both practicable but also environmentally preferable, and we think this here, that's what the district engineer did. What do you think we should do? What would be the most straightforward thing that you would want us to do? So, Your Honor, on I guess backing up and looking at the LEDPA argument, we think it's important to apply administrative exhaustion in this process. This is an office that issues roughly 1,000 permits a year, and they issue 100 standard permits like the driftwood permit. And so the court takes its notice and comment process very seriously. It followed that process here. No one raised Site 6 during that process, and so from the court's perspective, it was not given a fair opportunity and a full opportunity to really consider Site 6. So we would say exhaustion applies. Even if exhaustion did not apply, this did not prejudice the petitioners because the real-world facts at the time in 2019 when this permit was being issued, the real-world facts show that the site was unavailable. It was already permitted by the Corps, by the same office, for an entirely different project. And then as to mitigation, we think it's important that the Corps have discretion, the district engineer have discretion to choose the mitigation menu that is both environmentally preferable and also practicable. And that requires a certain amount of discretion, and we believe also that, as this court noted in Basin Keeper, the court's deference to these decisions is at a high-water mark because the Corps has to exercise its expert judgment when it's reviewing the record. So for all those reasons, we believe the petition should be denied and the Corps' permit should be upheld. Thank you, Mr. Heminger. Thank you. All right. For Driftwood, I'm not even going to try to pronounce your name. I'll let you do it for us. Thank you, Judge Smith. And may it please the Court, Gregory Garr on behalf of the interveners. Garr. All right. Thank you. Petitioners asked this court to set aside a permit issued by the Army Corps of Engineers after years of careful consideration based on arguments that were never timely raised by anyone to the agency during the public notice and comment period. Doing so would reward what amounts to sandbagging and invite an endless stream of proceedings that would prevent any major project, like the LNG facility in this case, which the responsible public agencies have determined is in the public interest and there is a public need for it from ever getting off the ground. This court should deny that request. With respect to waiver, as to Site 6, the comments that Ms. Everly referred to were not timely presented to the Corps, and that's made clear on page 4516 of the administrative record where the Corps officials noted that these comments were, quote, way outside of the public comment period, and so that they therefore wouldn't consider them. Now, considering that issue now would result in great prejudice to the Corps and Driftwood because if Mr. Teague or those comments had been presented by Healthy Gulf to the agency during the public notice and comment period, then Driftwood would have responded to those comments and the agency would have addressed those comments and they would have pointed out the obvious fact that is staring everyone in the face today, which is that Site 6 is subject to an alternative permit for a different project. It was a completely unavailable site, not to mention entirely practicable. So that argument fails for that reason alone. Are you going to address it in the context of latches, though, or is this just straight-up administrative exhaustion? This is straight-up administrative exhaustion of the kind that this court embraced in the Shrimpers case, Your Honor. It's a straightforward application of that. With respect to the beneficial use plan, the agency carefully explained its decision to include that component of the plan, which, to be clear, was a relatively small component of the overall compensatory mitigation plan. Seventy-two percent of the plan was achieved through mitigation credits, the preferred option, and only 28 percent was achieved through the beneficial use plan. But that 28 percent, Your Honors, will create 3,000 acres of coastal marshland, approximately ten times the size of the French Quarter. That's clear at page 300 of the administrative record. The agency also applied the Louisiana Rapid Assessment Method that this court embraced in the Basin Keeper case to determine what mitigation was appropriate, and applying that method,  by bank credits. That's clear from pages 435 and 433 of the administrative record. And so the beneficial use plan is immensely beneficial here and by far outweighs, as the agency itself found on page 299 of the administrative record, the mitigation that would be achieved through credits. With respect to latches and the general prejudice that Driftwood and the Corps face here, petitioners waited three years to bring their challenge to this permit, and four months after the construction on this permit had begun. They failed to even seek a stay from this court, and so as a result, we're over a year into construction on this project. All of the wetlands on the terminal site had been filled. The only thing that can... So nothing can be achieved with respect to those wetlands. The only thing that can happen if this court were to interfere with this permit is it would stop the ongoing mitigation efforts to offset those impacts that are already underway with respect to the beneficial use plan. We've constructed miles of levees that ultimately will become thousands of acres of coastal marshlands. So as a result of their delay, Your Honors, in bringing this, the wetlands that they are purportedly here to protect have been filled, and all this court can do is damage the environment by preventing ongoing mitigation efforts. So we think that that's a classic case for latches. The recent decision by the Supreme Court in Petrella does not involve this situation because that involved purely a request for legal damages. The request before this court is a request for equitable relief in the form of vacator of the permit. This court, in its Save Our Wetlands case, is recognized in that situation. Latches is appropriate where there's an inexcusable delay. There's absolutely no reason why they had to wait three years to bring this action. They waited two and a half years even to file a four-year request, and where that delay would result in extreme prejudice. We have invested over a billion dollars in this site already. The site has been cleared. There's hundreds of construction workers on those sites that would lose jobs if this was interfered with, and the responsible public agencies have determined that this facility is in the public interest and there is a public need for it. Particularly in that situation, there's absolutely no basis for this court to set aside this permit for a needless, completely pointless exercise of sending it back so that the agency can say what it already has asked this court to take judicial notice of, which is that Site 6 is permitted and that the agency can reiterate what is already said in its carefully reasoned decision, that the beneficial use plan is entirely appropriate and that the preference in the regulations are outweighed in this situation by the immense benefits of the additional thousands of acres of coastal wetlands that would be proposed in this case. And the last thing I would say on the beneficial use plan is that plan is actually required by Louisiana law. Louisiana law requires the beneficial use of dredging material where a certain amount of dredging takes place. So we were required to do that under Louisiana law, and that itself is a basis for allowing that small aspect of the mitigation plan, and that's clear from 73 Federal Register 14609, Your Honors. If there are no further questions, we would urge this court to deny the petition for review. Thank you, Mr. Garr. Ms. Eberle for Rabeau. Driftwood just stated that the wetlands have been filled. That is not anywhere in the docket before this court. I just checked the FERC docket yesterday. There isn't anything. We haven't seen these facts, and that's not presented before this case. It's certainly fair for you to point that out to us. Do you dispute those facts? We don't have enough information to know. So we would ask that this court require Driftwood to provide those facts if you think that this would have an impact on the outcome of this case and allow us to respond in supplemental briefing. Turning to the latches argument, latches is a gap-filling doctrine, and this is very clear from the Supreme Court's rulings in both Petrella and SCA hygiene products. Our obligation here is to show that we filed within the statute of limitations. The court has not contested that this lawsuit was timely filed. We filed within the statute of limitations, and latches is not available under Supreme Court precedent for statutory remedies, whether that's damages or here, vacatur. The APA specifically provides that vacatur is the appropriate remedy under that statute, and so latches isn't available or appropriate. Even if it was appropriate to consider latches here, Driftwood carries the burden of establishing both elements, both unreasonable delay and undue prejudice. They have not met that burden here. The court also, both the court and Driftwood, have focused on exhaustion, and here we've talked about the fact that these comments were sent to the court as well as to FERC as part of the NEPA process. Even if this court determines that they were not timely, which I believe that they were, as we talked about, because the NEPA process is part of the court's analysis under the Clean Water Act, but even if this court determines they were not timely, there's an exception that's well-established in Supreme Court precedent as well as this court's own precedent that anything obvious or otherwise brought to the agency attention is available for litigation. Here, there's no doubt that this was presented to the court. It was in the analysis from FERC that the court itself adopted, and there was no analysis of alternatives on which to comment until the draft environmental impact statement came out, and at that point, this expert member of the public did identify the Alternative Site 6 location. In the Shrimper's case, no one had commented on the particular alternative at issue. Here, we have a public comment that raised it and put it on the court's radar. In American Forest and Paper, this court determined that even though the entity had not participated in the agency's proceedings below at all, that that entity was able to come in during litigation. As far as the Big Lake fuels project, there is no indication that anything is happening with that project. We don't have the updated permit. We don't know what its new terms are, when it might expire, and the court is required to consider options that were not owned by the applicant. It's not clear how much overlap there is with these two sites, the court provides these maps that it asks this court to compare, but we don't have a real comparison. We don't know what the actual overlap is in the site footprints, or if there's a way to modify the Driftwood project in order to facilitate using that alternative site. So both the timeliness issue and this alternative permit are only relevant to the LEDPA claim. They are not connected with our mitigation claim. And here, the strong preference, at a minimum, it's a strong preference, and under the Atchafalaya case, there's indications that this court said, actually, no, it's a mechanical and rigid hierarchy. But even if it's a preference, there's a strong preference to increase the likelihood that mitigation will be successful. What is your response to opposing counsel, both of them mention of the 3,000 acres? Yes, Your Honor. Actually, only 650 acres are considered to be compensatory mitigation subject to specific performance standards, and the regulations require a greater than one-to-one ratio of destroyed wetlands to mitigation wetlands in order to ensure that the destruction is offset. So really, we're only talking about 650 acres, because all that extra acreage is not subject to the same planting requirements, the same performance standards, and even the court acknowledges in their memo for the record that we're really talking about the 650 acres. And here, the court concedes that it was error to say that it complied with the mitigation bank hierarchy, it marked N-A, and did not provide the rationale required to overcome the compensatory mitigation hierarchy. For these reasons, we ask that this court vacate the permit and remand to the court. Thank you, Ms. Everly. Your case is under submission. Thank you. The Abdallah case has been continued, so we'll now hear a loose term.